**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 93-CR-401-GRAHAM**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| v. | ) |
| | ) |
| **ATILANO DOMINGUEZ,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

**Government's Response to Defendant's Second Motion to Reduce Sentence**
**Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), and Specifically COVID-19**

Defendant **ATILANO DOMINGUEZ** has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying on the threat posed by the COVID-19 pandemic. This is not the Defendant's first request for a sentence reduction nor for compassionate release – with the Court having most recently denied his request for compassionate release on June 9, 2020 [DE 294], though this is the first time he notes COVID-19 as the specific reason for his request. The United States respectfully opposes the motion, as the government agrees with the U.S. Bureau of Prison's ("BOP's") assessment that the Defendant can be cared for – and that he can presently take care of himself – while in custody. The Defendant's medical condition has not changed since the Court's order three months ago denying compassionate release. The only change in circumstances is the existence of COVID-19 in the BOP system. The government does not contest that the Defendant's age and medical condition render him vulnerable to serious consequences if he were to contract the illness. However, the Defendant's sentence of life imprisonment always contemplated that the Defendant could perish in prison. The existence of one more way to perish in prison, specifically COVID-19 in addition to heart disease, cancer, stroke, aneurisms and myriad other ailments that afflict the aged, does not alter the appropriateness of the Defendant's

incarceration. It does not provide an "extraordinary and compelling reason" to release the Defendant. Additionally, the government submits that the factors under Section 3553 counsel against the Defendant's release. Therefore, the government respectfully submits that this Court should deny the motion with prejudice because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

### Factual Background and Summary of the Government's Argument

On December 10, 1993, Defendant ATILANO DOMINGUEZ, was found guilty by a jury trial as both charges of a two-count indictment, charging him with distribution of marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count 2), and conspiring to do the same, in violation of 21 U.S.C. § 846 (Count 1) [DE 86]. On November 9, 1993, the United States Attorney's Office filed a Notice of Enhancement, pursuant to Title 21, United States Code, Section 851 [DE 61]. A Pre-Sentence Report ("PSI") was prepared in anticipation of sentencing. At sentencing, the Defendant's total offense level was calculated to be a level 37. The Defendant was classified as a career offender and given a criminal history category of VI based on three previous convictions for cocaine trafficking. On February 28, 1994, the Defendant was sentenced to life imprisonment [DE 120].

Thereafter the Defendant appealed his conviction [DE 125], which appeal was denied [DE 144], and on February 25, 1997, filed his first habeas petition pursuant to T. 18, U.S.C., § 2255 [DE 153]. The petition was supplemented on May 14, 1997 [DE 167]. The petition, including the supplemental grounds, was denied on May 26, 1998 [DE 180]. In June 1998, the Defendant filed a motion to reconsider the denial of his petition and that too was denied [DE 181, 185]. On January 10, 2001, the Defendant filed another motion to reduce his sentence [DE 210] and that too was denied [DE 212]. On December 14, 2010, the Defendant filed a motion asking for a reduction pursuant to T. 18, U.S.C., § 3582 [DE 252], and later filed a motion to withdraw his guilty plea (though he was convicted at trial and not by plea) [DE255]. Both of those motions were also denied [DE 263]. On March 28, 2019, the Defendant filed a motion to

reduce his sentence pursuant to Amendment 782, captioned as a motion again under T. 18, U.S.C., § 3582 [DE 283], and discussing a variety of purported grounds for exercising leniency. That motion was denied on November 20, 2019 [DE 289].

In December 2019, the Defendant filed a motion to reconsider the Court's determination, arguing that the Court failed to conduct an analysis under the standard for compassionate release [DE 290]. The Court denied this motion on June 9, 2020, noting that the November 2019 order did in fact conduct an analysis under the compassionate release standard and found that the Defendant did not present "extraordinary and compelling circumstances" to satisfy the standard for release [DE 294].

Dominguez then filed the present motion for compassionate release [DE 300], which is his second request under the same standard previously considered by the Court (or third if the motion to reconsider is counted) but the first citing COVID-19 as the basis for his request. Nothing has materially changed since the Court denied the Defendant's last motion for compassionate release three months ago. The Defendant is 3 months older but thankfully his health has not substantially deteriorated since his last motion. This is not to argue that he does not have serious ailments, but they are ailments not unusual for an 80 year old male and he is still incarcerated in a federal penitentiary with an adjacent low security camp, not a medical facility.[1]

The Defendant's current motion under 18 U.S.C. § 3582(c)(1)(A) again seeks a sentence reduction resulting in his immediate release from the custody of the BOP, relying on the threat posed by the COVID-19 pandemic. The government acknowledges that the pandemic presents a new challenge for BOP to safeguard inmates' health, as it does for everyone, and that the Defendant's medical conditions place him at a high risk of succumbing to the virus if he were to

---

[1] The Defendant is incarcerated Lewisburg U.S.P, which is comprised of a high security building housing approximately 1,000 inmates and an adjacent low security camp housing approximately 250 inmates. The inmates and staff at the high security building and low security camp are kept separate to prevent potential COVID-19 transmission. The BOP website, as of September 9, 2020, reports that none of the inmates in the two facilities have been diagnosed with COVID-19 infections. While 8 staff have been diagnosed with COVID-19 infections, they are not at work and are in quarantine.

**Gov't Resp. to Def. Mot. to Reduce Sentence**                                                          3

catch it.  However, the Defendant's lengthy prison sentence – for life – always envisioned the possibility that the Defendant could perish in prison.  The existence of one additional way to perish does not alter the evaluation of the appropriateness of the Defendant's sentence, which he received based on evidence from a trial, and a lengthy list of prior narcotics trafficking convictions.  Unlike compassionate release motions that argue that a defendant should be released because the shorter sentence was never intended to put a defendant at risk of passing in prison, there is no injustice in the present case if the Defendant were to perish in prison.  The sentence of life imprisonment expressly contemplated the possibility of the Defendant's demise while incarcerated.

Furthermore, the government has no reason to disagree with BOP's assessment that the Defendant is fully functional in his present environment, can be cared for in prison and supports BOP's decision not to release the Defendant.  The government also submits that, given that the Defendant does not show remorse for his claimed "harmless crime" [DE 302-2 at 2] other than regretting that it resulted in his incarceration nor acknowledge the seriousness of the history of narcotics trafficking crimes he has committed, it cannot be concluded that the Defendant presents no risk of recidivism or danger to the community if he were released.  Finally, with the current state of infections in the U.S., the Defendant is no safer outside of BOP custody than within BOP in a facility that has no inmates with COVID-19 infections.

For all these reasons, the government submits that the Court should conclude that compassionate release is not warranted here.

**I.      BOP's Response to the COVID-19 Pandemic**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy.  In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority."  BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.  BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i.  The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January.  At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities.  Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan.  Those modified operations plan required that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.  Further, BOP has severely limited the movement of inmates and detainees among its facilities.  Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease.  Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least September 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Beginning on August 5, 2020, the BOP implemented Phase Nine of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their facilities and placed additional safeguards on the facilities' operations. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

**Gov't Resp. to Def. Mot. to Reduce Sentence** 6

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement.  On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.  That authority includes the ability to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).  Congress has also acted to enhance BOP's flexibility to respond to the pandemic.  Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).  On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission, and this discretionary authority was further broadened with additional guidance on April 22, 2020.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution.  BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead.  But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations.  For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public.  It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry.  It must marshal its resources to care for inmates in the most efficient and beneficial

manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.     Defendant's Administrative Requests for a Sentence Reduction

The Defendant sought release administratively from the BOP, and with specific reference to COVID-19, on August 12, 2020 [DE 302-2]. In his request, the Defendant wrote, "I committed a harmless crime 28 years ago[,] which I regret." (DE 302-2 at 2). BOP denied the release application, acknowledging the Defendant's concerns but finding that they did not warrant release [DE 302-2 at 1]. In essence, BOP determined that, while the Defendant did present with medical issues, BOP was capable of handling those issues.

Thereafter, the Defendant filed the instant motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that his health status makes him particularly vulnerable to becoming seriously ill from COVID-19 and that he is more likely to contract COVID-19 in prison than outside of prison.

## Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[2]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

**Gov't Resp. to Def. Mot. to Reduce Sentence**                                                              **9**

> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## Arguments

This Court should deny Defendant's motion for a reduction because, while the government acknowledges the Defendant's ailments place him into the high risk category if he contracted the virus, the Defendant has not established that "extraordinary and compelling reasons" support a sentence reduction.

**I.  This Court Should Deny The Motion Because Defendant Has Failed to Present "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction.**

The Defendant has not identified "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement, and the statutory sentencing factors of Section 3553 do not weigh in favor of his release.

**A.  Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.**

Defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020), *as revised* (Apr. 8, 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by

**Gov't Resp. to Def. Mot. to Reduce Sentence**                                                                      **11**

§ 3582(c)(1)(A).").[3] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[4] that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I). Similarly, in light of COVID-19, a defendant

---

[3] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

[4] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Apr. 2, 2020).

**Gov't Resp. to Def. Mot. to Reduce Sentence**           **12**

"experiencing deteriorating physical or mental health because of the aging process" may be found to have a substantially diminished ability to provide self-care within the environment of a correctional facility, even where the defendant's age-related decline in health otherwise would not have qualified. USSG § 1B1.13, cmt. n.1(A)(ii)(III). But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution.

In this case, Defendant has asserted that he suffers from a variety of ailments and, while these maladies and his age do place him within the high risk categories identified by the CDC, there is no basis to disagree with the BOP assessment – and the Court's assessment just three months ago – that the Defendant is presently in fair health for a person his age, he can care for himself and he can be cared for while in custody. Indeed, the Defendant's own exhibits show that BOP is keeping the Defendant's ailments under control (*see* 302-1 at 1: "He is doing well"; "He is at goal Continue his [medication]"; "BP remains in control Continue his present BP meds"; "He is at goal Continue his [medication]"; "Current – controlled with his [medication] every other day Continue his [medication]"; "He is doing well No chest pain"; "level was normal"; "Improved EF"). There has been no material change in the Defendant's health condition since the Court concluded three months ago that he did not merit release under the "extraordinary and compelling" standard. The same conclusion should be reached now and the Defendant's motion should be denied.

Moreover, the Defendant's sentence of life imprisonment always contemplated the possibility that the Defendant could perish in prison. This is not the case of someone serving a three-year sentence, for example, and suddenly – unexpectedly – finding themselves confronting a life-threatening illness due to incarceration. The Defendant's possible demise in prison, while serving a life sentence, is neither unexpected nor unjust. The existence of one more way for the Defendant to perish in prison, specifically COVID-19 in addition to heart disease, cancer, stroke,

**Gov't Resp. to Def. Mot. to Reduce Sentence** 13

aneurism and myriad other ailments that afflict an 80-year-old male, does not alter the appropriateness of the Defendant's incarceration.  In short, the Defendant's situation does not present "extraordinary and compelling reasons" for release.  Thus, the Defendant's motion should not be granted.

### B. The § 3553(a) Factors Weigh Against of His Release.

Alternatively, Defendant's request for a sentence reduction should be denied because he has failed to demonstrate that he otherwise merits release under the § 3553(a) factors.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2).  Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis.  *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

The Defendant was convicted of very serious crimes.  His sentence was based on evidence from a trial, where he denied his guilt, coupled with a criminal history of multiple cocaine trafficking convictions.  The seriousness of the Defendant's crimes counsel against his release and he continues to deny their seriousness.  In his BOP application, the Defendant calls the conduct that led to his trial conviction "a harmless crime" [DE 302-2 at 2].  The "regret" that he claims appears to be regret that his conviction has led to a lengthy sentence, not the crime itself which he calls "harmless."  Indeed, in his motion, he attempts to downplay the seriousness of his criminal history, portraying his sentence as the result of a mere marijuana conviction while ignoring that this offense was actually his *fourth* trafficking conviction and that the other convictions were for cocaine (Def. Mot. at 7).

It is particularly notable that this sentiment continues now, even 28 years after his crime and even though the Defendant has addressed the Court through multiple motions, never expressing remorse for his crimes nor acknowledging their seriousness.  Such sentiment is inconsistent with an individual who might arguably be a low risk for recidivism or not a danger to the community.  If the best that can be argued is that the Defendant is lower risk or not a

danger because he is older and has medical conditions, that too counsels against the Defendant's release.  History is unfortunately filled with examples of individuals who were able to participate in criminal activity despite being aged or somehow infirm.  The Defendant's motion on this ground should be denied.

Finally, there is no guarantee that the Defendant will be safer outside of BOP custody than in his current facility, where according to the BOP website on September 9, 2020, no inmates are infected with COVID-19.  Florida, the intended location of the Defendant's residence if released, is hardly a model State with a low incidence of infection or one of the States where statistics show declining cases.  Furthermore, the Defendant's age and maladies guarantee that he will need to seek medical treatment outside his home.  Thus, being removed from the BOP custody does not improve the Defendant's ability to avoid or survive the virus.  To that end, the Defendant has not provided a viable plan for his release.

Accordingly, in light of Defendant's record and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

## Conclusion

For these reasons, this Court should deny Defendant's motion for a sentence reduction with prejudice on the merits.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:   *Walter M. Norkin  /s/*
WALTER M. NORKIN
Assistant United States Attorney
Court ID No. A5502189
99 NE 4th Street, Room 718
Miami, Florida 33132-2111
Tel: (305) 961-9406

**Certificate of Service**

I certify that on September 9, 2020, I electronically filed this document with the Clerk of Court using the CM/ECF system and provided a copy to counsel of record via ECF.

> */s/ Walter M. Norkin*
> Walter M. Norkin
> Assistant United States Attorney